This Opinion is a
Precedent of the TTAB

Oral Hearing: April 24, 2019                    Mailed: November 21, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Ocean Technology, Inc.*

_____

Serial Nos. 87405211 and 87405233

_____

Stephen G. Janoski of Butzel Long,
    for Ocean Technology, Inc.

Cameron McBride, Trademark Examining Attorney, Law Office 106,
    Mary Sparrow, Managing Attorney.

_____

Before Ritchie, Greenbaum and Lynch,
    Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

Ocean Technology, Inc. ("Applicant") seeks registration on the Principal Register

of the following two proposed marks for goods ultimately identified as "crabmeat" in

International Class 29:[1]

_____

[1] Application Serial Nos. 87405211 and 87405233 were filed on April 10, 2017, based upon
Applicant's allegation of a bona fide intention to use the marks in commerce under Section
1(b) of the Trademark Act, 15 U.S.C. § 1051(b), for goods originally identified as "crabmeat;
package combinations consisting primarily of crabmeat; packaged entrees consisting
primarily of crabmeat; prepared appetizers consisting primarily of crabmeat."

On January 10, 2018, Applicant filed an Amendment to Allege Use in each application based
on a claim of first use anywhere and use in commerce since at least as early as May 31, 2017,
and amended the applications to the Supplemental Register to obviate descriptiveness

1. Serial No. 87405211: ALL NATURAL 100% REAL CALLINECTES CRAB GOURMET CRABMEAT PASTEURIZED and design,[2] displayed as



and

2. Serial No. 87405233: ALL NATURAL 100% REAL CALLINECTES CRAB FROM NORTH AMERICA GOURMET CRABMEAT PASTEURIZED and design,[3] displayed as

---

refusals under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1). However, in the August 2, 2018 Requests for Reconsideration filed in each application, Applicant amended the applications back to the Principal Register, asserting instead that the proposed marks have acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), and in the alternative, that they are inherently distinctive. The Examining Attorney did not accept the Section 2(f) claims, but did not reinstate the descriptiveness refusals even though Applicant withdrew its amendments to the Supplemental Register.

[2] The description of the mark reads: "The mark consists of the stylized wording 'ALL NATURAL' appearing above a crab design, with 'Gourmet' in stylized italicized font appearing over the crab's right claw, and 'CRABMEAT' in stylized uppercase font inside of a shaded banner appearing underneath the crab, and the stylized uppercase term 'PASTEURIZED' along the bottom portion of the mark. To the right of the crab design is a small label consisting of a stylized circular design and the following wording: '100% REAL Callinectes CRAB,' with each term appearing directly under the first."

[3] The description of the mark reads: "The mark consists of the stylized wording 'ALL NATURAL' appearing above a crab design, with 'Gourmet' in stylized italicized font appearing over the crab's right claw, and 'CRABMEAT' in stylized uppercase font inside of a shaded banner appearing underneath the crab, and the stylized uppercase term 'PASTEURIZED' along the bottom portion of the mark. To the right of the crab design is a small label consisting of a stylized circular design and the following wording: '100% REAL



The applications differ only by the wording FROM NORTH AMERICA that is present in the second proposed mark but absent from the first. "CRAB" and "CRABMEAT" are disclaimed in both of the proposed marks, and color is not claimed as a feature of either of them.

In each application, the Trademark Examining Attorney has refused registration of Applicant's proposed mark under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that it fails to function as a mark because it is merely informational, consisting of non-source indicating informational terms and matter that would not be perceived as identifying and distinguishing Applicant's goods from those of others or indicating their source.[4] The Examining Attorney also has refused registration because Applicant failed to comply with a requirement to provide information about the identified goods issued pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b).

---

Callinectes CRAB,' and under which appears separately 'from NORTH AMERICA,' with each term appearing directly under the first."

[4] The Examining Attorney consistently references Sections 1, 2, 3 and 45 of the Trademark Act as the basis for the failure to function refusals. Section 3 of the Trademark Act, 15 U.S.C. § 1053, applies to marks for services, not goods, and therefore is not applicable here.

When the refusals were made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the requests for reconsideration, the appeals were resumed. Applicant and the Examining Attorney filed briefs and participated in oral argument. We affirm both refusals to register in each application.

## I. Consolidation

These appeals present common questions of law and fact and records that are identical, or nearly so. Therefore, in the interest of judicial economy, we consolidate them and decide them in this single opinion. *In re Anderson*, 101 USPQ2d 1912, 1915 (TTAB 2012). We have considered all arguments and evidence filed in each appeal and taken into account relevant factual differences between them.[5]

## II. Applicable Law

### A. Trademark Rule 2.61(b) Requirement for Information

Trademark Rule 2.61(b) provides that the examining attorney "may require the applicant to furnish such information, exhibits, affidavits or declarations ... as may be reasonably necessary to the proper examination of the application."

In the July 12, 2017 Office Actions issued in each application, the Examining Attorney required Applicant to (i) explain whether the goods "do or will consist of" "all natural, 100% real Callinectes crab" (in Serial No. 87405211) and "all natural,

---

[5] Citations are to TTABVUE and the Trademark Status and Document Retrieval (TSDR) record downloaded in .pdf format for application Serial No. 87405233.

100% real Callinectes crab from North America" (in Serial No. 87405233),[6] (ii) supply samples of advertisements or photographs featuring the identified goods or, if such were not available, of similar goods, and (iii) provide a written statement detailing the nature, purpose and channels of trade of the goods.

The Examining Attorney advised Applicant why the information was pertinent to assessing registrability of the proposed marks, namely, that refusal on the ground that the proposed marks are deceptive under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), or alternatively deceptively misdescriptive under Section 2(e)(1) of the Trademark Act, may be appropriate if Applicant responded that the goods "do not or will not consist of" "all natural, 100% real Callinectes crab" (in Serial No. 87405211) and "all natural, 100% real Callinectes crab from North America" (in Serial No. 87405233). Applicant did not respond to the requirements, which were made final in each February 16, 2018 Office Action as to "100% real Callinectes crab," the advertisements or photographs, and the written statement.

In its August 2, 2018 Requests for Reconsideration, and in response to a requirement for information about the identification of goods in each application, Applicant amended the identification of goods to the current, single item, namely "crabmeat," arguing that this amendment "clearly describes the goods and makes the examiner's demand for further information moot." The Examining Attorney accepted

---

[6] Merriam-Webster defines "Callinectes" as "a genus of swimming crabs (family Portunidae) comprising the New World blue crabs" and "North America" as a "continent of the Western Hemisphere … including … the United States [and] Mexico …." Attached to the July 12, 2017 Office Action, TSDR pp. 16, 18.

the amendment in each application, but did not consider Applicant's argument to be responsive to the requirements for information, which he maintained.

Applicant has a duty to respond to an information request from the Examining Attorney. *See In re AOP LLC*, 107 USPQ2d 1644, 1651 (TTAB 2013); *see also Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 73 USPQ2d 1409, 1415 (Fed. Cir. 2005) (interpreting the USPTO's counterpart patent rule on information requests and holding that "[s]o long as there is some legitimate reason for seeking the information … the applicant has a duty to respond."); TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 814 (Oct. 2018). If Applicant does not believe it has relevant information, Applicant should submit a statement to this effect. *In re Planalytics, Inc.*, 70 USPQ2d 1453, 1457 n.2 (TTAB 2004). An applicant's failure to respond to an information requirement is grounds for a refusal. *See In re DTI P'ship LLP*, 67 USPQ2d 1699, 1701 (TTAB 2003) ("The Trademark Rules of Practice have the effect of law, and failure to comply with a request for information is grounds for refusal of registration."); *see also AOP*, 107 USPQ2d at 1651; *In re Cheezwhse.com Inc.*, 85 USPQ2d 1917, 1919 (TTAB 2008).

We find that the Examining Attorney's information requirements were reasonably necessary to the proper examination of the applications, as stated in Trademark Rule 2.61(b), because the information is directly relevant to whether the wording in the proposed marks is deceptive or deceptively misdescriptive of the identified "crabmeat," and thus whether additional grounds for refusal exist.[7] *See AOP*, 107

---

[7] In cases where an applicant fails to comply with Trademark Rule 2.61(b) requirements, the Board also has relied on adverse factual presumptions in affirming alternative substantive

USPQ2d at 1651 (affirming Rule 2.61(b) refusal based on evasive response to information requirement that was relevant to potential descriptiveness and misdescriptiveness refusals). We disagree with Applicant's argument that the identification amendments moot the more specific information requirements, and consider the amendments nonresponsive to the requirements.[8] In view of the above, the refusals to register Applicant's proposed marks because Applicant failed to respond to the Trademark Rule 2.61(b) final requirement for information are proper and are affirmed in each application.

Applicant's failure to comply with the Trademark Rule 2.61(b) requirements is a sufficient basis, in itself, for affirming the refusals to register Applicant's proposed marks. *See DTI P'ship*, 67 USPQ2d at 1702. Nevertheless, for purposes of completeness, we consider whether the proposed marks are merely informational under Sections 1, 2 and 45 of the Trademark Act.

---

refusals in addition to refusing registration based on the lack of response to the information requirement. *AOP*, 107 USPQ2d at 1651 (noting that since "applicant has inexcusably failed to comply with the information requirement" the Board will address the issue of whether the mark is merely descriptive, or alternatively deceptively misdescriptive of the goods, "based on the presumption" that "the responses would have been unfavorable.") (citing *e.g.*, *Cheezwhse.com*, 85 USPQ2d at 1919).

[8] The questions concerning whether the goods "do or will consist of" "all natural, 100% real Callinectes crab [from North America]" would still be relevant to deceptiveness even if the goods were limited to "crabmeat." And contrary to Applicant's apparent argument in its Reply Brief, discussed infra at n.13, the specimen does not moot the information requirement.

### B. Failure to Function – Informational

#### 1. Statement of the Law

"[A] proposed trademark is registrable only if it functions as an identifier of the source of the applicant's goods or services." *In re DePorter*, 129 USPQ2d 1298, 1299 (TTAB 2019) (citing Sections 1, 2 and 45 of the Trademark Act). "The Trademark Act is not an act to register mere words, but rather to register trademarks. Before there can be registration, there must be a trademark, and unless words have been so used they cannot qualify." *In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976).

Whether matter applied for as a trademark functions as a trademark depends on how it would be perceived by the relevant public. *In re Eagle Crest, Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010); *In re Aerospace Optics, Inc.*, 78 USPQ2d 1861, 1862 (TTAB 2006). We make this determination by reviewing the specimens and other evidence of record showing how the applied-for matter is used. *In re Hulting*, 107 USPQ2d 1175, 1177 (TTAB 2013) (quoting *Eagle Crest*, 96 USPQ2d at 1229). "The more commonly a [term or expression] is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a trademark." *Id*. Where the evidence suggests that the ordinary consumer "would take the words at their ordinary meaning rather than read into them some special meaning distinguishing the [goods] from similar [goods] of other[s]," then the words fail to function as a mark. *In re Standard Oil Co.*, 275 F.2d 945, 125 USPQ 227, 229 (CCPA 1960); *accord Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 57 USPQ2d 1902, 1909-10 (4th Cir. 2001) (where consumers would perceive "You Have Mail" in

its ordinary meaning rather than as an indicator of a single source, then the phrase may not be protected as a trademark); *Cosmetically Sealed Indus. Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 43 USPQ2d 1956, 1958 (2d Cir. 1997) ("[T]he challenged phrase 'Seal it with a Kiss' (with or without the two exclamation points) is a clear instance of a non-trademark use of words…. The [plaintiff's] phrase 'sealed with a kiss' is a fixture of the language….").

Mere intent that a word, design, symbol, or slogan function as a trademark, or the fact that such designation appears on the specimen, is not enough in and of itself to make it a trademark. *See In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 90 (CCPA 1980); *In re Manco, Inc.*, 24 USPQ2d 1938, 1941 (TTAB 1992) (citing *In re Remington Prods. Inc.*, 3 USPQ2d 1714, 1715 (TTAB 1987)). To be a trademark, the proposed mark must be used in a manner calculated to project to purchasers or potential purchasers a single source or origin for the goods. *Bose,* 192 USPQ at 215; *In re Volvo Cars of N. Am. Inc.*, 46 USPQ2d 1455, 1459 (TTAB 1998).

2. Analysis

The Examining Attorney contends that Applicant's proposed marks,

 and  , will not be perceived as trademarks for the identified "crabmeat" because they are presented in an informational manner and consist of terms that are commonly used in Applicant's trade or industry to denote

the purity, quality, ingredients, and, in application Serial No. 87405233, the geographic origin, of crabmeat and other food products. In addition to relying on the way the proposed marks appear on the specimen, to support this contention, the Examining Attorney cites to evidence of third party use of the literal terms, and third party use of similar pictorial representations. We also consider evidence in the form of declarations submitted by Applicant.

### a. Evidence of Third Party Use of Wording

As support, the Examining Attorney submitted printouts from a number of third-party purveyors of seafood (and related products such as seafood stock and seasoning for seafood) showing use of the same or effectively synonymous terms to inform purchasers of the quality, ingredients and geographic origin of the products. The most relevant evidence, which pertains to crabmeat, fish and other types of seafood, is summarized below:[9]

- Cameron's Seafood sells "100% authentic Maryland Blue Crabs."

- Cheat!ng Gourmet sells "BLUE CRAB CROSTINI" described as a "gourmet treat" featuring "100% Real Blue Crab meat."

- Florida Blue Crab sells crab cakes made with "100% real lump crab meat with no fillers."

---

[9] The summarized evidence is attached to the July 12, 2017 Office Action, TSDR pp. 19-22, and the February 16, 2018 Office Action, TSDR pp. 8-10, 12, 14, 17, 19, 21, 22, 24-26.

- Maryland Blue Crab Express sells frozen "Blue Crab Meat Lump - 100% Domestic Product of U.S.A." described as having been "picked domestically" to "ensure[] that we always have the best possible crab meat."

- Handy sells "Callinectes Crab Meat From Mexico" touted as "all-natural, sweet crab meat from Callinectes crabs" with benefits including "Better flavor and texture" "Your assurance – no species substitutions" and "No preservatives for better flavor."

- Fat Crab offers "All Natural – No Preservatives" "Callinectes SPP" from Mexico, touting that "[w]e include the fat when pasteurizing our crabmeat to enrich and accentuate its flavor."

- Giant Food sells Sebastian fresh crab meat lump. The sole listed ingredient is "100% Blue Crab Meat The Callinectes Sapidus/The Real Blue Crab."

- The Village Inn menu features several dishes made with "100% Real Maine Lobster."

- Gorton's offers "Beer Battered Fish Tenders" made with "100% real fish" "no fillers" "no artificial colors, flavors or preservatives."

- Henry & Lisa's Natural Seafood sells "All Natural Uncooked Shrimp"

- Mele Bistro, a restaurant that lists "the origin of each item on the menu … next to the item on the menu," touts "Our North American jumbo sea scallops are handpicked scallops," "All of our shrimps are from North America and packaged in North America" and "All of our seafood are from … North America …."

- The menu for Hollywood East Café offers "Gourmet Seafood" including dishes featuring lobster, Dungeness Crab, and oysters.

- Harry & David offers various "Gourmet Food & Wine" products, including "gourmet seafood."

- Maureen C. Berry, a "writer," "cook" and "photographer," posted an article titled "Pasteurized Crab Meat: A Lesson in Buying" on her blog.

- Capital Seaboard offers "Pasteurized Crab Meat" from various species including "Domestic Blue Crab," and explains that when fresh crab meat is not in season, "[t]hese gaps in production are filled, by some, with premium pasteurized crab meat varieties."

- Twin Tails offers BOSS brand "Pasteurized Crab Meat."

Applicant contends that the proposed marks are not merely informational, but rather are suggestive and capable of showing the source of the goods. The standard for a failure to function refusal is not whether the proposed mark is suggestive rather than descriptive, but whether the relevant public will recognize it as a trademark identifying only one source. *See In re Phoseon Tech., Inc.*, 103 USPQ2d 1822, 1827 (TTAB 2012) (noting that the critical inquiry in determining whether a proposed mark functions as a trademark is the "commercial impression it makes on the relevant public (e.g., whether the term sought to be registered would be perceived as a mark identifying the source of the goods or merely as an informational phrase)"). The evidence outlined above shows use of the wording (and close variations thereof) in the proposed marks by others in the industry to convey their ordinary meanings

and provide purchasers with general information about crabmeat and other food products, including lobster, fish and seafood, and supports a finding that the wording of the proposed marks would be perceived as merely informational rather than as a source indicator for crabmeat in this case. *In re Wal-Mart Stores, Inc.*, 129 USPQ2d 1148, 1153 (TTAB 2019) (widespread informational use of the wording by others indicates consumers would not associate it with a particular source). Indeed, the wording in the proposed marks just informs consumers that the goods are pasteurized crabmeat from the Callinectes crab that is gourmet and all natural.

### b. Stylization and Design Elements

The proposed marks also include stylization, background carriers, and a crab design. "A display of … unregistrable matter is not registrable on the Principal Register unless the design features of the asserted mark create an impression on the purchasers separate and apart from the impression made by the words themselves…." *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1639 (Fed. Cir. 2016) (quoting *In re Sadoru Grp., Ltd.*, 105 USPQ2d 1484, 1486 (TTAB 2012)). In this case, the fonts of the wording are not particularly notable or distinctive. *See Sadoru Grp., Ltd.*, 105 USPQ2d 1484 (stylization insufficient given blue "slightly stylized block lettering"). There is nothing about the block and cursive lettering that creates its own impression, apart from the wording. *See In re Northland Aluminum Prods. Inc.*, 777 F.2d 1556, 227 USPQ 961, 964 (Fed. Cir. 1985) (affirming the TTAB's rejection, as generic, of a stylized mark that was "not so distinctive as to create a commercial impression separate and apart from the" word (BUNDT) itself).

Similarly, the circular design around the wording "100% REAL CALLINECTES CRAB" on the right side of the proposed marks is a common geometric shape that consumers likely would perceive as a background design or carrier to the enclosed wording, rather than as a separable design element with trademark significance. *See Guess? Inc. v. Nationwide Time Inc.*, 16 USPQ2d 1804, 1805 (TTAB 1990) (a common, geometric shape, particularly one serving as a carrier or background design element, is not usually considered distinctive). *Cf. In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1829 (Fed. Cir. 1988) (background portion of a mark, and part of the background portion of a mark, "is registrable only if it performs a trademark function in and of itself.") (internal quotations omitted).

We now consider whether the inclusion of the crab image, which appears in the middle of the informational wording of both proposed marks, renders the overall composites not merely informational. The Board and our primary reviewing court (the Federal Circuit and its predecessor the Court of Customs and Patent Appeals) have well developed case law on the treatment of accurate pictorial depictions of wording in the context of likelihood of confusion and descriptiveness cases, wherein such representations are often considered to be similar to, or simply reinforcement of, the meaning of the wording. The rationale underlying those cases provides a useful framework in the context of failure to function (informational) cases for determining whether a pictorial representation of identified goods (or services) or of wording that is informational, is itself informational. We therefore consider the relevant analogies in our case law.

In the context of likelihood of confusion, our precedent shows that a design mark may be found to be confusingly similar to a word mark where the pictorial depiction and the wording convey a similar connotation and commercial impression. *See, e.g.*, *Shunk Mfg. Co. v. Tarrant Mfg. Co.*, 318 F.2d 328, 37 USPQ 881, 883 (CCPA 1963) ("We have before us, in opposing array, a picture and a word used in conjunction with a picture. Both have the same meaning, viz.: a Scotchman and all that the term implies. … It is well settled that words and the symbols identified thereby will be given the same significance in determining the likelihood of confusion between two marks.") (citation omitted); *Pink Lady Corp. v. L.N. Renault & Sons, Inc.*, 265 F.2d 951, 121 USPQ 465, 466 (CCPA 1959) ("It is well settled that words and the symbols identified thereby will be given the same significance in determining the likelihood of confusion between two marks.") (citations omitted); *In re Dutch Maid Ice Cream Co.*, 95 F.2d 262, 37 USPQ 202, 202 (CCPA 1938) ("Appellant would not be entitled to register the word 'Dutchland' because of the prior registration. Neither could he register as a trade-mark a picture which conveys the same meaning as the word."); *In re Rolf Nilsson AB*, 230 USPQ 141 (TTAB 1986) (silhouette of a lion's head and the letter "L," for shoes, likely to cause confusion with the mark LION for shoes); *In re Duofold Inc.*, 184 USPQ 638 (TTAB 1974) (design of an eagle lined for the color gold, for sports apparel, likely to cause confusion with GOLDEN EAGLE and design of an eagle, for clothing). However, a likelihood of confusion may not be found where a pictorial representation in a mark is so highly stylized or abstract that it would not readily evoke in the consumer's mind the wording featured in another mark. *See, e.g.*,

*In re Serac, Inc.*, 218 USPQ 340, 341 (TTAB 1983) (concluding that a design mark was "so highly stylized that an image of a ram's head would not be immediately discerned and the connection with [the cited registered mark] 'RAM's HEAD' would not be readily evoked with the resulting generation of a likelihood of source confusion.").

In a similar vein, a visual representation is merely descriptive under Section 2(e)(1) of the Trademark Act if it consists merely of a picture or illustration of the goods or services, or of something that is an important feature or characteristic of them. *See In re Singer Mfg. Co.*, 255 F.2d 939, 118 USPQ 310, 311-12 (CCPA 1958) ("It is, of course, true that a design consisting merely or essentially of a pictorial representation of the goods on which it is used is descriptive, and is not a valid trademark.") (citation omitted); *In re Underwater Connections, Inc.*, 221 USPQ 95, 95 (TTAB 1983) (stylized representation of a compressed air gas tank found merely descriptive of travel-tour services involving underwater diving); *In re Eight Ball, Inc.*, 217 USPQ 1183, 1184 (TTAB 1983) (representation of a cue stick and eight ball found merely descriptive of billiard parlor services although "technically not an accurate depiction of a cue stick and ball"); *Thistle Class Ass'n v. Douglass & McLeod, Inc.*, 198 USPQ 504, 511 (TTAB 1978) (finding pictorial representation of a thistle merely descriptive of the class of sailboats sold by the applicant, the Board notes that "it is a well established principle of trademark law that a picture or design and the word which describes the design are legal equivalents that must be treated as such in proceedings of this character") (citations omitted).

A composite mark likewise is considered to be merely descriptive when it consists of descriptive wording and a design element that is a pictorial representation of the goods, or that reinforces the descriptive meaning of the wording. *See DuoProSS Meditech Corp. v. Inviro Med. Devices Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1758 (Fed. Cir. 2012) (finding that the combination of the term SNAP and the design of a broken exclamation point, viewed as a whole, would be perceived as depicting the snapping of a syringe plunger); *In re Swatch Grp. Mgmt. Servs. AG*, 110 USPQ2d 1751, 1762 (TTAB 2014*), aff'd per curiam*, 599 F. App'x 959 (Fed. Cir. 2015) (finding that the design of a tourbillon (a watch component) combined with the word TOURBILLON "reinforces the singular impression conveyed by the mark as a whole" as merely descriptive for "jewellery, horological and chronometric instruments"). However, if the design is not merely an illustration of the goods, or is a highly stylized pictorial representation of descriptive matter, the design is not merely descriptive. *See In re LRC Prods., Ltd.*, 223 USPQ 1250, 1252 (TTAB 1984) (outline of two gloved hands arbitrary and fanciful and not merely an illustration of the identified "gloves") (and cases discussed therein).

We now hold that this concept is equally applicable to determining whether an accurate pictorial representation of a word is informational and incapable of identifying the source of the goods.

### c.    Third Party Use of Photorealistic Crab Images

The image of the crab in the proposed marks appears to be a photorealistic, accurate pictorial representation of a crab. We find nothing stylized, fanciful or

abstract about the image. As such, the crab image in the proposed marks does not detract from the commercial impression of the word "crab." The crab image simply informs prospective consumers that the associated product is crabmeat, and it reinforces the informational nature of the wording surrounding the image. Indeed, the image in the proposed marks is highly similar and in some instances nearly identical to what appear to be photographic images of actual crabs used by others in the marketplace to inform customers of the product for sale, i.e., crabs and crabmeat. For example, the webpages for Cameron's Seafood and Cheat!ng Gourmet,[10] reproduced below, display such images along with the informational wording set forth above:



---

[10] Attached to the July 12, 2017 Office Action, TSDR 19-20.



This third-party usage further supports our findings that in the context of a crab product, the public would perceive the crab image in the proposed marks to be merely informational, and that inclusion of the image does not transform the proposed marks into trademarks when they are viewed in their entireties.

d. Applicant's Specimen

We agree with the Examining Attorney that the proposed marks, as displayed in their entireties on Applicant's specimen[11] below (which is identical in both applications), "just convey[] the contents of the package to consumers, and do[] not

---

[11] Applicant's specimen in each application included a second page showing the lid for the packaging, but it does not display either of the proposed marks, and so is not reproduced or further considered in this decision.

show any indication of source that may be perceived by the general public."[12] 9 TTABVUE 8.



The specimen displays the proposed marks on the side of the product container in a manner that simply informs purchasers that the package contains all-natural, gourmet, pasteurized, 100% pure Callinectes crabmeat (from North America, as to application Serial No. 87405233). Nothing in the combination of wording, carriers, font and crab design in the proposed marks (which, as noted above, do not claim color as a feature of the marks) results in a registrable composite. Rather, this evidence supports a finding that the proposed marks, as a whole, fail to function as trademarks for the identified goods. *See Eagle Crest*, 96 USPQ2d at 1229 ("Slogans and other terms that are considered to be merely informational in nature, or to be common laudatory phrases or statements that would ordinarily be used in business or in the particular trade or industry, are not registrable."); *Aerospace Optics*, 78 USPQ2d at

---

[12] In the Amendment to Allege Use, Applicant describes the specimen as "photographs of product packaging for a corresponding product."

1864 (SPECTRUM failed to function as a trademark for illuminated pushbutton switches because it was used in a manner that merely informed potential purchasers of the multiple color feature of the goods). Ultimately, both the content of the proposed marks and the way they are presented lead to a determination that, viewed in their entireties, they are informational rather than source-indicating.[13]

### 3. Applicant's Consumer Perception Evidence Unpersuasive

In each application, Applicant has attempted to overcome the failure to function refusal by variously amending to the Supplemental Register, claiming that the proposed mark has acquired distinctiveness, and asserting that the proposed mark is inherently distinctive. However, matter that does not indicate the source or origin of the identified goods and distinguish them from those of others cannot be registered because it does not meet the statutory definition of a trademark. *See* Sections 1, 2 and 45 of the Trademark Act. This is so regardless of the register on which registration is sought (i.e., Principal or Supplemental), or a claim of acquired distinctiveness.[14] *See In re Boston Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058

---

[13] In the section of its Reply Brief about the Trademark Rule 2.61(b) Requirement for Information, Applicant appears to argue that the specimen moots the information requirement because "information as set forth on the product packaging could not be clearer." "The actual packaging … obviously expressly articulates the product and its truthful description." 10 TTABVUE 4. These statements reinforce our finding that consumers who encounter the proposed marks on the identified goods would perceive the proposed marks as merely conveying information about the goods.

[14] Consequently, we need not consider Applicant's claim of acquired distinctiveness under Section 2(f) of the Trademark Act based on ownership of a prior registration, and based on the declarations of Applicant's President, Edward M. Dixon, and three "knowledgeable customer/industry representatives." Request for Reconsideration, 4 TTABVUE 6. Applicant submitted this evidence with the Request for Reconsideration in each application, asserting, in the alternative, that the proposed mark is inherently distinctive based solely on the four declarations. 4 TTABVUE.

(Fed. Cir. 1999) (THE BEST BEER IN AMERICA "is so highly laudatory and descriptive of the qualities of its product that the slogan does not and could not function as a trademark" and is incapable of acquiring distinctiveness under Section 2(f)); *Water Gremlin*, 208 USPQ at 90 ("Appellant's asserted intention to adopt the package design to indicate source may well be true, but intent or lack of intent at the time of adoption of a particular design is not controlling. **Nor is proof that a particular container actually functions as a means of indication of source to some purchasers. Not all designs or words which in fact indicate or come to indicate source will be restricted in use to a single merchant.**") (emphasis added; citation omitted); *In re Helena Rubenstein, Inc.*, 410 F.2d 438, 161 USPQ 606, 608 (CCPA 1969) (a proposed mark "cannot properly be registered as a trademark, even on the Supplemental Register, unless it is intended primarily to indicate origin of the goods and is of such a nature that the ordinary purchaser would be likely to consider that it indicated such origin").

We consider the declarations of Mr. Dixon and the three "knowledgeable customer/industry representatives" as Applicant's evidence in support of its argument that the proposed marks function as trademarks because consumers recognize them as such. *See Eagle Crest*, 96 USPQ2d at 1229 (public perception critical in determining whether a term or expression functions as a trademark).

However, these declarations have limited probative value as evidence to demonstrate that either of the proposed marks is perceived as indicating a single source for the identified "crabmeat." Mr. Dixon's declaration is replete with general

and conclusory statements and omits any documentary evidence to support Applicant's position that consumers perceive this matter as source-indicating in contrast to the evidence submitted by the Examining Attorney. In addition, the claims about Applicant's sales figures and "confidential" advertising expenditures are not supported by documentary evidence, or put into context in the relevant market, and, in any event, that type of information is more directed to the question of acquired distinctiveness rather than capability.

The three other "customer/industry representative[]" declarants use nearly identical form language to attest to their familiarity with Applicant and its products, and their personal experience with Applicant's use of each of the proposed marks as a trademark to identify Applicant as the source of the products. Applicant characterizes the declarants as "experienced customers, vendors, and distributors in the relevant food, fish, and seafood industries." Request for Reconsideration, 4 TTABVUE 7. However, three declarations is a rather small number, and it is not clear that the declarations from industry insiders with whom Applicant does business reflect the perceptions of most relevant purchasers of "crabmeat," who include ordinary members of the general public. *See In re Pennzoil Prods. Co.*, 20 USPQ2d 1753, 1758 (TTAB 1991) (form declarations from nine marketers of oil products who have business relationships with the applicant "lack persuasiveness on the issue of the primary significance of the [proposed mark] to the purchasing public.").

### 4. Conclusion

Having considered all of the evidence of record, we find that: Applicant presents the proposed marks in a manner that just conveys information about the identified

crabmeat; a number of third parties in the industry use wording that is the same as, or similar to, each of the proposed marks to convey information about their products; third parties use similar pictorial representations to provide information about their crabmeat and seafood products; and the inclusion of stylization, insignificant background carriers, and a realistic image of a crab, does not alter our conclusion regarding consumer perceptions of the proposed marks as a whole. *Cf. D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710, 1717 (TTAB 2016) (stylized proposed mark with design element **I ♥ DC** failed to function as a mark); *Guess? Inc. v. Nationwide Time Inc.*, 16 USPQ2d at 1805 (a common, geometric shape, particularly one serving as a carrier or background design element, is not usually considered distinctive). Although it is possible for "the whole [of a mark to] be greater than the sum of its parts," *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1831 (Fed. Cir. 2015), we do not find that to be true of Applicant's proposed marks. Rather, "the entire formulation does not add any meaning to the otherwise [informational] mark." *See In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1421 (Fed. Cir. 2005). Accordingly, Applicant's proposed marks would not be perceived as identifying a particular source of goods. While we have given careful consideration to Applicant's evidence of alleged consumer perception (i.e., the four declarations) solely to determine whether the proposed marks function as trademarks, the evidence is insufficient to demonstrate that the relevant consumers recognize the proposed marks as indicating the source of the identified goods rather than as merely informational. *See Eagle Crest*, 96 USPQ2d at

1229. Accordingly, Applicant's proposed marks fail to function as trademarks for Applicant's goods.

**Decision**: The refusals to register Applicant's proposed marks,

 and                 , are affirmed.